[Crim. No. 5367. First Dist., Div. One. July 7, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EARNEST NORMAN, Defendant and Appellant.

Earnest Norman, in pro. per., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed from a judgment sentencing him to state prison following his conviction, after trial by the court, of burglary in the second degree (Pen. Code, §§ 459-460)[1] with an admitted prior conviction of a violation of the Jones-Miller Narcotic Act by a federal court.

In his notice of appeal he specified "Excessive Bail," "Appointment of Counsel" and "Illegal Search and Seizure" as grounds for appeal. Thereafter he applied to the trial court, and repeatedly to this court for an order fixing bail on appeal. All of his motions were denied. He seeks review of these post-judgment orders in addition to alleged errors which led to his conviction.

Following the filing of the record with this court, and in response to defendant's prior and subsequent applications therefor, counsel was appointed to represent defendant on this appeal. On receipt of counsel's complaint that defendant refused to furnish him the typewritten record, defendant was advised of the complaint, and was warned that if he failed to cooperate with counsel, counsel would be relieved. Defendant advised the court: "I am not a lawyer But I will present my

---

[1]Defendant was also convicted of grand theft, which was charged in a second count, but no sentence was imposed because both charges arose out of the same incident. (See Pen. Code, § 654.)

case myself and I will do it to the best of my ability, having developed a basic distrust for court designated counsels and *B*eing unable to employ one I will remain in pro per as I was at my trial.'' Counsel was thereupon relieved. A subsequent inquiry from defendant concerning appointment of an attorney to argue his case, elicited an offer by the court to entertain such a request, but defendant remained adamant in his distrust of appointed attorneys.

Thereafter this court granted defendant's ''Application for an Order Directing the Furnishing of Additional Records on Appeal,'' action on which had been deferred pending review by appointed counsel.

On January 17, 1966, defendant filed with the court a 39-page ''Petition for a Writ of Supersedeas.'' This instrument, in the form of a brief, contains defendant's statement of the case, presents 31 questions involving defendant's original three points, and reference to additional constitutional principles which he alleges were violated in the proceedings leading to his conviction. It is supported by reference to 35 decisions of the United States Supreme Court, 18 decisions of the courts of this state, and numerous constitutional, statutory and regulatory provisions. The relief sought in the petition was summarily denied, but it was ordered filed as an opening brief. It was augmented, following the filing of the additional record, by a lengthy ''Supplement to Appellant's Opening Brief'' which presented seven points supported by citation of 91 cases and numerous miscellaneous authorities. The various contentions advanced by defendant have for convenience been grouped and considered as set forth below. Although he has displayed acumen and some erudition in fashioning a protective armor of constitutional principles, the facts upon which he must rely do not fit within its shelter. No reversible error has been found, and the judgment must be affirmed.

### Statement of Facts

On Sunday, June 20, 1965, at about 5 a.m., Peter Daubenspeck, an employee of the Plaza Hotel on Post Street, heard the sound of breaking glass. From his position in front of the hotel, a half block from the Roberts Brothers Fur Store, at 272 Post Street, he observed a Negro male carrying furs from Roberts Brothers to a car parked nearby. He saw the man get into the car and drive west on Post Street past where he was standing. The witness observed the car and its occupants more closely when the car stopped for a red light at Post and

Stockton Streets. He saw that the same man was driving, and that a Negro female was sitting next to him. Daubenspeck got the license number, went down to look at the fur store, and then telephoned the police to report what he had observed. He described the vehicle to the police as a black Cadillac convertible with a white top, having a license number that he thought was LEU with some sixes in it.

Sometime after 5 a.m., Officer William Roberts saw a black Cadillac proceeding west on Post Street. He recognized the car as belonging to Felmon Castleberry, and he recognized the driver as Earnest Norman, the defendant. Roberts testified he had known the defendant since 1958 or late 1957, and that he was positive of his identification of the defendant as well as his identification of the female in the car, and the license number of the car, which he had previously memorized. Shortly thereafter, when the police radio broadcast the information telephoned in by Daubenspeck, Roberts contacted communications and notified them that he had just seen the car. Because of his familiarity with the car, Officer Roberts informed communications of the proper license number, IEU 466, the name of the owner of the car, and that the car was headed for the Fillmore area. He did not, however, then report his identification of the occupants. Roberts' communication was also broadcast.

Shortly after 5 a.m., Officer Robert McDonnell, who had heard the first police communication, saw the Cadillac parked on Fillmore Street. He observed the defendant standing, slightly bent, next to the car. He saw two other people sitting in the front seat of the automobile, a female sitting on the passenger side (later identified as Willie Sanders), and a male sitting in the middle of the seat (later identified as Ulysses Todd).

He notified communications of his observations, and asked for assistance. He noticed the defendant starting to walk away very quickly, and he ordered the defendant to stop. McDonnell had a police dog in the rear of his vehicle, and, as the defendant walked away, the dog came to the rear window and growled and barked at the defendant. The defendant then came over to the police car. The policeman explained that the Cadillac was wanted in connection with a crime, and asked the defendant to sit in the police car.

McDonnell approached the Cadillac and observed what appeared to be a bundle of furs, wrapped in a light cloth, in the back seat of the vehicle. He questioned the occupants of

the car, and they informed him that the defendant had been driving the car. The officer placed the defendant and the Cadillac's two occupants under arrest. He asked the defendant if he had the keys to the automobile. The defendant replied that he did not. Further examination of the bundle in the back seat revealed the stolen furs. The car was impounded. An examination of the car for fingerprints, on June 21, 1965, revealed defendant's fingerprints on the steering wheel spoke, the rear view mirror, and the frame of the left vent window. Fingerprints of Willie Sanders were also found, but no other usable prints appeared.

At trial, Eva Battle, mother of Felmon Castleberry, testified that she lent the Cadillac to the defendant on June 16, 1965. She testified that the defendant was supposed to keep the car for one day. When he had not returned the car, Mrs. Battle phoned the defendant's aunt and told her that she would report the Cadillac as stolen if it were not returned that Sunday. Mrs. Battle later received a call that the car had been wrecked. She went to the Fillmore area to look for the car, but did not find it. When she next went to look for the car, she heard about the defendant's arrest and the impounding of the car. Mrs. Battle testified that she had not actually reported the car as stolen.

Willie Sanders testified. She said that the defendant had requested that she go for a ride with him. After the defendant received permission from her boyfriend, Ulysses Todd, to take her on a ride, she accompanied the defendant. Mrs. Sanders testified that on that evening she was very tired, she had been drinking, and she had been up for a couple of nights. She testified that she sometimes got ''under the spells . . . and this was one of my times.'' She testified that, at the beginning of the ride, she was dozing fitfully. She remembered that the defendant parked the car and said he would be right back. She then heard a crash. She testified that she ''went to scream,'' but the defendant, who had returned to the car with some objects in his hands, including a fur coat, told her not to scream. She testified that she remained awake and saw the defendant return to the store a second time to get more furs. The defendant then, according to Mrs. Sanders, drove back to the Fillmore area and parked the car.

She testified that until they returned to the Fillmore area, she and the defendant were the only occupants of the Cadillac. Ulysses Todd got in the Cadillac at that time, since the defendant was going to drive Mrs. Sanders and Todd home.

Mrs. Sanders testified the defendant then left the car for about five minutes. As he was returning to the car, the police arrived.

The defendant attempted to impeach Mrs. Sanders' testimony by questioning her on her prior convictions. A search of the witness' record indicated she had not been convicted of a felony.

Ulysses Todd was brought from prison at the defendant's request to testify in his behalf. Todd invoked the protection of the Fifth Amendment.

The defendant testified in his own behalf. He declared he had borrowed the Cadillac from Mrs. Battle. He testified that Mrs. Sanders had requested that he drive her downtown so that she could make some money, but he refused. Defendant declared that since he believed that the car had been reported stolen, he had abandoned the car with the keys under the visor on Saturday evening. On Sunday morning, he stopped in a restaurant for some 10 to 15 minutes and as he was leaving the restaurant he observed the car with Mrs. Sanders and Todd in it. It was parked a block away from where he had abandoned it. He testified that, as he "walked by the car," an officer pulled up in a station wagon. He testified that the police officer and the dog jumped out of the car, and although the dog never touched him, he then went over to the car to talk to the policeman.

The manager of the restaurant testified that defendant was in the restaurant for about 8 to 10 minutes prior to his arrest.

Additional facts are set forth in connection with the issues to which they pertain.

*Arrest and Search and Seizure*

Defendant contends that he was arrested without probable cause while he was walking down the street, and that the illegality of his arrest taints the remaining proceedings. (See *Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-488 [9 L.Ed.2d 441, 453-456, 83 S.Ct. 407]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-768 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Haven* (1963) 59 Cal.2d 713, 717-721 [31 Cal.Rptr. 47, 381 P.2d 927]; and *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 273 [294 P.2d 23].) He relies upon the principle, "Defendant made a prima facie case that the search and seizure were illegal when he established they were made without a warrant. The burden then rested on the prosecution to show proper justification." (*People* v. *Haven, supra,* 59 Cal.2d 713, 717, and cases cited.)

If it be assumed that the seizure of the furs, and the subsequent lifting of the fingerprints from the Castleberry car are necessarily related to defendant's arrest, there is evidence to show adequate justification. The arresting officer had a radio communication on a suspected burglary of a fur store, which described the vehicle he discovered by make and body style. He associated the defendant with the vehicle because the driver's seat was empty and the defendant was standing alongside the car. On investigation he observed the bundle containing furs in the back seat of the vehicle, and he was told that defendant had been driving the vehicle. There was reasonable cause to believe that defendant and the occupants of the car had committed a felony. (Pen. Code, § 836, subd. 3; *People* v. *Schellin* (1964) 227 Cal.App.2d 245, 249-251 [38 Cal.Rptr. 593] cited with approval in *People* v. *Webb* (1967) 66 Cal.2d 107, 111-112 [56 Cal.Rptr. 902, 424 P.2d 342]; and see *People* v. *Perryman* (1967) 250 Cal.App.2d 813, 817-818 [58 Cal.Rptr. 921]; and *People* v. *Cooper* (1967) 249 Cal. App.2d 479, 482-483 [57 Cal.Rptr. 588].)

Defendant contends that the seizure of the furs and subsequent examination of the automobile for fingerprints violate the precepts laid down in *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777. 84 S.Ct. 881] and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67], which prohibit the search of a vehicle without a search warrant.

In the first place, fur was visible from the outside of the car, and no search was involved. (*People* v. *Nieto* (1966) 247 Cal.App.2d 364, 370-371 [55 Cal.Rptr. 546]; *People* v. *Green* (1965) 235 Cal.App.2d 506, 510-511 [45 Cal.Rptr. 371]; and see *People* v. *Terry* (1964) 61 Cal.2d 137, 152 [37 Cal.Rptr. 605. 390 P.2d 381] [distinguished but not overruled in *People* v. *Burke, supra,* 61 Cal.2d at p. 580]; and *People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 25 and 27-28 [34 Cal.Rptr. 718].)

Secondly, if the seizure of the furs be considered a search and seizure within the Fourth Amendment of the United States Constitution, or section 19 of article I of the Constitution of this state, it was reasonable because it was incidental to the legal arrest of defendant and the other occupants of the car. (*People* v. *Webb, supra,* 66 Cal.2d 107, 111-112; *People* v. *Burke, supra,* 61 Cal.2d 575, 580.)

The fingerprint evidence could in no event have been prejudicial insofar as it placed defendant in the car at some time

during the period preceding the burglary. Other witnesses testified that he had been driving the car, and the prior use of the car was admitted by him. Nevertheless, the fact that the expert found no usable prints, other than those identified as belonging to defendant and to Willie Sanders, may have had some significance in rebutting defendant's contention that Todd rather than himself was Willie's companion when the car was observed on the felonious mission.

The subsequent cases of *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788]; and *People* v. *Webb, supra*, 66 Cal.2d 107, have qualified, if not overruled (see dissenting opinions 386 U.S. at pp. 62-65, 17 L.Ed.2d at pp. 734-736; 66 Cal.2d at p. 128) the language in *Preston* and *Burke* which suggested an inflexible requirement of a search warrant unless the search of an automobile was incidental to a legal arrest.

Both *Cooper* (386 U.S. at p. 59, 17 L.Ed.2d at p. 732, 87 S.Ct. at p. 700), and *Webb* (66 Cal.2d at p. 114) reiterate from Preston, "whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case. . . ." In *Cooper* the court stated " 'the reason for and nature of the custody may constitutionally justify the search,' " and held that there was no violation of the Fourth Amendment by a search of a vehicle legally held for forfeiture proceedings pursuant to the provisions of section 11611 of the Health and Safety Code of this state. (386 U.S. at p. 61, 17 L.Ed.2d at p. 733, 87 S.Ct. at p. 791, and see *People* v. *Webb, supra,* at pp. 126-127.) In *Webb* the court distinguished *Burke* and *Preston* on the grounds that the search in each of those cases was "general and exploratory in nature, a search for evidence of a crime which the police did not yet know the defendant had committed" (66 Cal.2d at p. 124). It was noted: "Here, as we have seen, the officers lawfully began to search defendant's car at the scene of his arrest and found the highly incriminating balloon of heroin on the floor in front of the driver's seat. At that point they had convincing grounds to believe defendant was guilty of the crime of unlawful possession of narcotics, and accordingly had the right to continue searching his car as an incident to the arrest for the purpose of recovering further evidence by which the offense had been committed." (66 Cal.2d at p. 124.) The court, in the course of the opinion, further recognized that an automobile may be itself evidence of the crime, referring to, among other cases, *People* v. *Talbot*

(1966) 64 Cal.2d 691, 708 [51 Cal.Rptr. 417, 414 P.2d 633];
and *People* v. *Miller* (1966) 245 Cal.App.2d 112, 139-141 [53
Cal.Rptr. 720] (*id.,* p. 123, fn. 3; and see *People* v. *Smith*
(1966) 63 Cal.2d 779, 800-801 [48 Cal.Rptr. 382, 409 P.2d
222].)

Here the particular automobile was definitely linked with
the burglary by the testimony of the eyewitnesses and of the
officer who saw it pass by. The discovery of the furs, whether
because they were visible without a search, or because of a
valid search incidental to the arrest, further identified the car
as that used in the burglary. It was proper to take the car
into custody to see what it, through scientific examination,
might reveal as to the identity of its occupants.

The defendant disclaimed any connection with the car
at the time of his apprehension, or at any time subsequent
to late Saturday evening when he abandoned the car on
Eddy Street off Fillmore. The fact that he disclaimed any
interest in the automobile searched or in the furs seized would
not alone deprive him of the right to challenge the legality of
a search of the car and the seizure of the furs. (*People* v.
*Martin* (1955) 45 Cal.2d 755, 759 [290 P.2d 855]; and see
*People* v. *Gale* (1956) 46 Cal.2d 253, 257 [294 P.2d 13].)
Nevertheless if, as the facts showed, the car did not belong to
him, and was being sought by its owner's mother, the authori-
ties were justified in impounding it until claimed by its
rightful owner. (*People* v. *Smith, supra,* 63 Cal.2d 779, 800-
801.)

There is no merit to defendant's objections to his
arrest, or to the use against him of the evidence taken from
the car, either at the scene, or subsequently while it was in
police custody. The court properly denied his motion to
suppress, and overruled the objections he made on the
grounds that the evidence was illegally obtained.

## Prearraignment Interrogation

On June 22, 1965, at 10 a.m., Inspector Eugene Osuna
visited the defendant at city prison. Inspector Osuna advised
the defendant that he did not have to make a statement, that
he had a right to have an attorney present, and that anything
he said would be used against him. The defendant declared that
he did not wish to make a statement until he had seen his
attorney. Osuna testified that when he was taking defendant
back to the compound defendant said, "About that car, I was
never in a car." Osuna said that, when he pursued the

subject, the defendant declared, "Well, I'd rather not talk about it now."

Osuna testified that he then questioned Todd, and at the latter's request the defendant was brought to the interview. The inspector asked Todd if he had any connection with the burglary, and Todd replied: "No. You better talk to Mr. Norman about it. . . . The only thing in my case was that I happened to be found in the car. I was in the restaurant, and my girl friend, Willie Sanders, came over and got me. We came back, sat in the car, and I was arrested at that time."

Osuna then asked defendant if he wanted to make some statements that could clarify the situation in view of what Todd had said, and Norman then stated "that he was standing on the corner at Ellis and Fillmore Streets, approximately 4:30 p.m. [*sic*], and he saw a Cadillac car pull up, and it stopped on the northwest corner of Fillmore, facing south. At that time he saw two people alight from the car. They were both colored. One was a man and one was a woman. And he saw them go into the corner restaurant. . . . it was a little dark and he could not recognize them. . . . he'd taken a walk and he came back five minutes later and he saw the two people come out of the restaurant . . . he started to walk towards the car, and at that time he was apprehended."

Defendant made a preliminary objection, in response to which the inspector testified that he had advised defendant of his rights, and that all of defendant's statements were voluntary. No further objections were interposed to the testimony concerning either his statements or those of Todd.

He now seeks to attack the use of this evidence on several grounds.

No showing has been made in support of his contention that there was an unwarranted delay in taking him before a magistrate. (Cf. Cal.Const., art. I, § 8; Pen. Code, §§ 825 and 849; and see *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608]; and *Mallory* v. *United States* (1957) 354 U.S. 449 [1 L.Ed.2d 1479, 77 S.Ct. 1356].) Under the provisions of section 825 of the Penal Code, "two days after his arrest, excluding Sundays and holidays" had not expired at the time of the Tuesday morning interview.

In any event, "it is well settled that 'A violation of a defendant's right to be taken before a magistrate within the time specified by the law does not require a reversal unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result

thereof.' (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4]; . . ." (*People* v. *Wilson* (1963) 60 Cal.2d 139, 154 [32 Cal.Rptr. 44, 383 P.2d 452].)

Defendant's attempt to show prejudice by the fact that statements were elicited from him during the period of detention founder on the fact that they were made before his detention extended into an unauthorized period, and upon the doctrine that since there is no evidence that the illegal detention produced the admission, the exclusionary rule is inapplicable. (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 11 [291 P.2d 929].)

The record shows compliance with the requisites of *People* v. *Dorado* (1965) 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361]. Defendant's trial during the period July 30 to August 13, 1965, antedates *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], so the standards there imposed are inapplicable. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

Defendant asserts that his original statement, "At this time I do not wish to make a statement until I've seen my attorney" should not have been allowed in evidence. (See *People* v. *Ridley* (1965) 63 Cal.2d 671, 676 [47 Cal.Rptr. 796, 408 P.2d 124]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116]; and *People* v. *Maldonado* (1966) 240 Cal.App2d 812, 816-817 [50 Cal.Rptr. 45].) There was no objection to this testimony. It is questionable whether it was offered for the prohibited purpose of giving rise to an inference of guilt from silence, or for the purpose of showing that he understood his rights when he subsequently made the statement attributed to him. In any event, no reversible error appears under the standards applied in *Cockrell* (63 Cal.2d at pp. 668-669), or those more recently promulgated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. The record as a whole enables this court to declare its belief that the error, if any, was harmless beyond a reasonable doubt.

Defendant further asserts that he should have been cautioned again of his legal rights, before he was confronted with the statement made by Todd. He made no prejudicial admissions at that time, but gave an explanation of his presence on the street which he later reiterated at the trial. He had already acknowledged his cognizance of his legal rights and there was no reason for the officer to reiterate them. (See

*People* v. *Nieto, supra,* 247 Cal.App.2d 364, 369-370.) If there was such a duty, the legal principles last referred to would preclude reversal for any error in receiving the second statement of defendant.

Defendant has failed to show any illegal practices before arraignment which prejudiced his case. In the absence of more specific objection than that interposed by defendant there was no prejudicial error in receiving the evidence of his statements.

### *Bail Before Conviction*

Defendant claims that he was denied due process of law, and that his rights under the Eighth and Fourteenth Amendments of the United States Constitution, under section 6 of article I of the California Constitution, and under section 985 of the Penal Code, were violated by an order which fixed bail in an excessive sum, and by the trial court's denial of his repeated motion to reduce bail. (Pen. Code, § 1289.)

After conviction the question of whether or not there was error in the orders fixing and refusing to reduce the amount of bail would appear to be moot and academic. (See *People* v. *Brown* (1960) 184 Cal.App.2d 588, 596 [7 Cal.Rptr. 717].) The orders were not appealable. (See Pen. Code, § 1237; and *People* v. *Thompson* (1956) 144 Cal.App.2d Supp. 854, 859 [301 P.2d 313].) "Habeas corpus is an appropriate procedure in which to raise such questions. [Citations.]" (*In re Newbern* (1961) 55 Cal.2d 500, 503 [11 Cal.Rptr. 547, 360 P.2d 43]; and see *Ex parte Duncan* (1879) 54 Cal. 75; *In re Morehead* (1951) 107 Cal.App.2d 346, 349 [237 P.2d 335]; *In re Tsuji Horiuchi* (1930) 105 Cal.App. 714 [288 P. 708]; *In re Berman* (1930) 105 Cal.App. 270 [287 P. 373]; *In re Aydelotte* (1929) 97 Cal.App. 163 [275 P. 510]; *In re Martin* (1921) 51 Cal.App. 706, 707 [197 P. 365].)

Defendant insists that he was denied due process of law, and that he was prejudiced because the unconstitutionally excessive bail prevented him from securing his release and retaining his own counsel. (Cf. *People* v. *Brown, supra,* 184 Cal.App.2d 588, 596.) Whether the orders in question are reviewable under the terms of section 1259 of the Penal Code[2] would appear to depend upon whether they affected the sub-

---

[2]Penal Code section 1259 provides: "Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made

stantial rights of the defendant. His representations to the trial court may be questioned in view of the fact that according to his version of events (of which there is no record, but which went unchallenged before the lower court) he was released on $1,100 bail, following his appearance in the municipal court on June 22, 1965 (see Pen. Code, §§ 1273, 1st par., subd. "First"; and 1276). He was not recommitted until surrendered by his bondsman sometime after the indictment was filed July 1, 1965, and he was first arraigned thereon July 7th. Yet during this period he made no arrangements for counsel and appeared in superior court with an assistant public defender.

Although the foregoing discussion should dispose of the issue, in view of the constitutional issues raised, defendant's contentions are examined.

Section 985 of the Penal Code provides: "When the information or indictment is for a felony, and the defendant, before the filing thereof, has given bail for his appearance to answer the charge, the court to which the indictment or information is presented, or in which it is pending, may order the defendant to be committed to actual custody, unless he gives bail in an increased amount, to be specified in the order."

An endorsement on the indictment fixed bail in the sum of $10,000, plus $1,000, pursuant to section 13521 of the Penal Code. (See Pen. Code, §§ 945, 982, 1273, 1st par., subd. "Third," 1284; and *People* v. *Lollis* (1960) 177 Cal.App.2d 665, 671 [2 Cal.Rptr. 420] [overruled on other grounds in *People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934]].) The order fixing bail on the indictment did not refer to the bail he had given "for his appearance to answer the charge," or to an increase in that original amount but set forth a new and greater independent amount. Defendant urges that the statute requires an order increasing the amount (cf. Pen. Code, § 1289) and that he was denied due process of law because of noncompliance. Some credence is given his views by the following statement in *People* v. *Lepori* (1917) 35 Cal.App. 60 [169 P. 692, 694] : "Charge may mean a 'formal complaint, information, or indictment' [citation]."

in and considered by the lower court, and which affected the substantial rights of the defendant. The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

(35 Cal.App. at p. 63.) In that case, however, the word was held not to refer to all three forms of accusatory pleading in the conjunctive, but merely to that for which the bond was given—the information.

In *Ex parte Cook* (1868) 35 Cal. 107, the defendant had surrendered himself to a justice of the peace, on a charge of murder, waived an examination, was committed, and was admitted to and posted bail. Subsequently he was indicted and a bench warrant was issued for his arrest without bail. The court construed sections 269 and 270 of the Criminal Practice Act (Stats. 1851, ch. 29, §§ 269 and 270, p. 241) the precursors of present Penal Code sections 985 and 986, and stated: "The statute is not, perhaps, as clear as upon this question as it might be made, but enough is said to show that it is not intended to fetter the County Court in the exercise of its jurisdiction over the person of the defendant, after an indictment has been found against him, by reason of any proceedings previously had in the premises. On the contrary, if bail has been taken, it has been taken to secure his appearance at the County Court, and to hold him amenable to its orders and process (Sec. 516) [see Pen. Code, § 1278], the same as if he were in actual custody. If that court is of the opinion that the bail already given is sufficient security, it may allow it to stand unchanged, but if not, it has the power to order him to give additional bail or go into custody; and if, in its judgment, it is a case in which bail ought not to be taken, the court may order him into custody notwithstanding any bail which may have been given before the indictment was found. It would be anomalous to hold that the court can, as it undoubtedly may, compel the defendant to come into court by its warrant, for the purpose of giving additional bail or going into custody on a bailable offense, and yet cannot compel him to come into court and go into custody on a charge which may not be bailable at all." (35 Cal. at p. 109.)

Section 986 expressly provides, in reference to the "order" which is the subject of section 985: "If he [the defendant] is not present, a bench warrant must be issued and proceeded upon in the manner provided in this chapter." (See also Pen. Code, § 1273, 1st par., subd. "Third," § 1310, subd. 3, and 1314.)

There is no merit in defendant's claim that he was erroneously committed for failure to post the bail required by the indictment, because he had posted lesser bail in proceedings before the magistrate.

Defendant appeared for arraignment on July 7th with an assistant public defender and the matter was continued for plea to July 9th. At that time an attorney, allegedly employed by defendant's family, made a motion to reduce the bail. On July 19th, in the absence of defendant, but with appearances by the public defender and. defendant's special counsel, the motion was considered by the court and denied. The clerk's transcript and the minutes therein are barren of reference to any affidavits, testimony, or other evidentiary matters submitted in support of this motion.

On July 30th, to which date the case had been continued for trial, the court clerk and defendant erroneously assumed that bail had been reduced to $5,500, and defendant suggested, but did not move for, a further reduction of bail as a solution to the problem of securing counsel who would serve compatibly with his desires. A week later, on the second day of trial, the defendant formally renewed his motion to reduce bail and after the court was advised—correctly—that the prior motion had been denied, the second motion met the same fate.

The record reveals the following facts which might bear on the question of the amount of bail fixed for defendant. The goods stolen had a market value in excess of $12,750. Defendant had been arrested by Officer Roberts in 1958. He had a prior conviction for a federal narcotic offense in 1959 and served a term at Terminal Island from January 12, 1959 to December 10, 1962; and from October 28, 1964 to May 26, 1965 he was in the San Francisco County jail in federal custody, under different circumstances. At the time of his arrest he was out on bail pending an appeal from a second conviction for an undisclosed offense in federal court in January 1965.

From the record it appears that he had a family interested enough in him to secure an attorney to seek a reduction in the amount of his bail. The application for bail on appeal filed with the trial court does not set forth any facts concerning his personal history, or status, which would assist that court in determining whether to exercise its discretion to admit him to bail on appeal. The application to this court indicates that he has a wife and family dependent on him for support, and that he made all appearances necessary under the $1,100 bail originally fixed in municipal court. It may be assumed that his written second application for reduction of bail presented to the trial court on August 6th contained the same facts.

"In fixing the amount of bail, the judge or magistrate shall take into consideration the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his appearing at the trial or hearing of the case." (Pen. Code, § 1275, portion; and see *In re Newbern, supra,* 55 Cal.2d 500, 504; *Ex parte Duncan, supra,* 54 Cal. 75, 77-79; *In re Morehead, supra,* 107 Cal.App.2d 346, 349-350; and *In re Tsuji Horiuchi, supra,* 105 Cal.App. 714, 715-716.)

"The fixing of the amount of bail is largely within the discretion of the trial court and the appellate courts will not interfere unless an abuse of this discretion is manifest. Only when it is apparent *per se* that the amount fixed is 'unreasonably great and clearly disproportionate to the offense involved' will we order a reduction. (*In re Tsuji Horiuchi,* 105 Cal.App. 714, 715 [288 P. 708].)" (*In re Morehead, supra,* 107 Cal.App.2d 346, 349; and see also *Ex parte Duncan, supra,* 54 Cal. 75, 78; and *Ex parte Duncan* (1879) 53 Cal. 410, 411-412.)

Section 1289 of the Penal Code provides for the increase or reduction of bail "upon good cause shown" after it is once fixed upon an indictment.[3] "An order altering its amount not based on a showing of good cause is an arbitrary exercise of judicial power, unauthorized by section 1289 of the Penal Code, . . ." (*In re Berman, supra,* 105 Cal.App. 270, 272; and see *In re Aydelotte, supra,* 97 Cal.App. 163, 165.) The foregoing cases which deal with arbitrary increases of bail, should be distinguished from the power of the court in which the indictment is returned to increase any bail fixed by the magistrate. The former power rests upon the provisions of section 1289, whereas the latter power arises from the provisions of section 1273, first paragraph, subdivision "Third." (See *In re Aydelotte, supra,* 97 Cal.App. 163, 165; Pen. Code, §§ 945, 985, 986, 1284, 1310, subd. 3, and 1314; and *Ex parte Cook, supra,* 35 Cal. 107, 109.)

Finally, defendant attacks the penalty assessment appended as part of his bail for the contingent benefit of the Peace Officers Training Fund under the provisions of section 13521 of the Penal Code. He claims that it not only violates state

---

[3]Section 1289 of the Penal Code provides: "After a defendant has been admitted to bail upon an indictment or information, the court in which the charge is pending may, upon good cause shown, either increase or reduce the amount of bail. If the amount be increased, the court may order the defendant to be committed to actual custody, unless he give bail in such increased amount. If application be made by the defendant for a reduction of the amount, notice of the application must be served upon the district attorney."

and federal constitutional provisions against excessive bail, but also that it in effect is a bill of attainder in violation of the provisions of clause 3 of section 9, and clause 1 of section 10, of article I of the United States Constitution, and the provisions of section 16, of article I, of the Constitution of this state, because it is an arbitrary penalty imposed by the Legislature on those convicted. (Cf. *Department of Social Welfare* v. *Gardiner* (1949) 94 Cal.App.2d 431, 432-433 [210 P.2d 855].) Various objections to somewhat similar provisions first embodied in section 773 of the Vehicle Code in 1953 (§§ 42050-42053 of the Veh. Code of 1959) have been considered and rejected by the courts of this state. (*Sawyer* v. *Barbour* (1956) 142 Cal.App.2d 827 [300 P.2d 187], passim; *People* v. *Aronow* (1955) 130 Cal.App.2d Supp. 898, 900 [279 P.2d 840].) No merit is found in defendant's objections.

In the light of the foregoing principles the defendant has failed to show that the amount of bail fixed upon the indictment was determined in an erroneous manner, or that it was excessive. Nor has he demonstrated an abuse of discretion in the denial of his motions to reduce bail, or that the rulings on the matter of bail "adversely affected the outcome of the case." (*People* v. *Brown, supra,* 184 Cal.App.2d 588, 596.)

*Waiver of Right to Counsel*

On July 7, 1965, defendant was arraigned on the indictment and the record reflects that he was represented by "the Public Defender." A representative of that office was present on July 9th when counsel secured by defendant's family appeared specially to move for reduction of bail. On that occasion the district attorney moved to substitute photographs for all but one of the furs held in evidence. This motion was granted. (The propriety of this ruling is hereinafter discussed.) On the 16th, to which date the matter had been regularly continued, the defendant, with the public defender present, entered his pleas of not guilty to each count, denied the prior conviction, and, with the consent of his counsel, waived a jury trial. The matter was set down for trial by the court on July 22d.

On that date the defendant made a motion for the appointment of counsel other than the public defender under the provisions of section 987a of the Penal Code. The motion was denied. Defendant then stated: "I make a motion to proceed in pro per at this time, and waive my rights to counsel, . . ." After discussion, in which defendant voiced some of

the objections to his appointed counsel which are discussed below, and pressed for a decision on his motion, it was granted. The court, despite defendant's objection, ordered the assistant public defender to sit at the counsel table to give defendant advice if he asked for it. The case was continued for trial at defendant's request.

Eight days later the case was called for trial in another department of the court. The assistant public defender originally assigned was present. The judge's inquiry as to whether defendant had counsel resulted in a discourse which produced a renewal of defendant's motion for counsel other than the public defender. Defendant stated, ''appointment of counsel . . . of my own choosing, . . . I'm just making the motion. I'm making my record.'' This motion was denied.

At the conclusion of the first days of trial, defendant advised the court that he would object to the public defender's office assisting him in obtaining the presence of witnesses, and stated he did not want help from that source.

He now contends that he was deprived of the right to counsel conferred by the Sixth and Fourteenth Amendments of the United States Constitution, and section 13 of article I of the Constitution of this state.(See *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]; *People* v. *Douglas* (1964) 61 Cal.2d 430, 434 [38 Cal.Rptr. 884, 392 P.2d 964].) It is clear that he was furnished the services of the public defender, and refused to accept them. Unless there were grounds warranting that refusal (cf. *People* v. *Douglas, supra,* 61 Cal.2d 430, 435), the failure to accept the proffered services was an effective waiver of his right to counsel. (*People* v. *Mattson* (1959) 51 Cal.2d 777, 793-794 [336 P.2d 937]; *People* v. *Turner* (1967) 249 Cal.App.2d 909, 928 [57 Cal.Rptr. 854]; *People* v. *Bourland* (1966) 247 Cal. App.2d 76, 83-84 [55 Cal.Rptr. 357]; *People* v. *Ortiz* (1961) 195 Cal.App.2d 112, 115-116 [15 Cal.Rptr. 398]; *People* v. *Green* (1961) 191 Cal.App.2d 280, 283-284 [12 Cal.Rptr. 591]; *People* v. *O'Ward* (1959) 168 Cal.App.2d 127, 132 [335 P.2d 762]; *People* v. *Morgan* (1956) 140 Cal.App.2d 796, 801-802 [296 P.2d 75]; *People* v. *O'Neill* (1947) 78 Cal.App.2d 888, 891 [179 P.2d 10].)

''Our constitutional guarantee that an accused 'shall have the right . . . to appear and defend, in person and with counsel' (Cal. Const., art. I, § 13; Pen. Code, § 686), substantially similar to that accorded federal defendants by the Sixth Amendment to the United States Constitution (*People* v. *Matt-*

*son* (1959) 51 Cal.2d 777, 795 [21] [336 P.2d 937]), is satisfied by the appointment and appearance of the public defender in behalf of the accused (the latter also being present). 'There is nothing in the law which entitles an accused to have the court appoint any particular attorney to defend him, and the refusal of the court to name a particular counsel was not a denial of defendant's right to be represented by counsel for, as said in *People* v. *Manchetti* (1946) 29 Cal.2d 452, 458 [175 P.2d 533] : ". . . defendant had no absolute right to be represented by a particular attorney." (See also *People* v. *Stroble* (1951) 36 Cal.2d 615, 629 [226 P.2d 330]; affd. (1952) 343 U.S. 181 [96 L.Ed.872, 72 S.Ct. 599]; *People* v. *Howard* (1957) 150 Cal.App.2d 428, 430 [310 P.2d 120]].)' (*People* v. *Williams* (1959) 174 Cal.App.2d 364, 377 [3] [345 P.2d 47].)" (*People* v. *Hughes* (1961) 57 Cal.2d 89, 98-99 [17 Cal.Rptr. 617, 376 P.2d 33]; accord: *People* v. *Bourland*, *supra*, 247 Cal.App.2d 76, 82.)

In *Bourland* this court collated several rules, which are pertinent here, as follows: " 'It is well settled law that if a defendant, during the course of the trial, becomes dissatisfied with the manner in which his counsel has handled his case and wishes to discharge counsel for that reason he has a constitutional right so to do [citations], subject to the supervisory powers of the trial court to see that such discharge does not result in an uninformed and unintelligent waiver of the right to counsel. . . .' [Citation.] There is, however, 'no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims.' [Citations.]

" 'A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused.' [Citations.] " (247 Cal.App.2d at pp. 84-85.)

Defendant attempts to show that his dismissal of the public defender was warranted. He first contends that he was entitled to the appointment of another attorney as a matter of right pursuant to the provisions of section 987a[4] of the Penal

---

[4]Penal Code section 987a provides in part: "In any case in which counsel is assigned in the superior court to defend a person, including a person who is a minor, who is charged therein with the commission of a crime, or is assigned in a municipal or justice court, to represent such a person in such a court and who desires but who is unable to employ

Code upon showing a "conflict" between himself and the public defender. The provisions of the section preclude the appointment of other than the public defender in a county where there is a public defender, unless the specific exception of the statute is met. (*People* v. *Hughes, supra,* 7 Cal.2d 89, 98.) The contention, " 'The mere fact that an accused in a capital case lacked confidence in the public defender should be sufficient grounds standing alone to disqualify him'' has been rejected as unsupported by the provisions of the section. (*People* v. *Williams, supra,* 174 Cal.App.2d 364, 378.) A reading of the section indicates that the "conflict" referred to is a conflict between the obligations the public defender may have to another and those which he would owe to the defendant if he chose to represent both parties. It does not refer to a conflict between the views of the defendant and the public defender in regard to the strategy to be adopted in presenting the defendant's case.

It is unnecessary to consider defendant's attack on the constitutionality of section 987a on the grounds that it denies equal protection under the Sixth Amendment of the United States Constitution, that it is vague and ambiguous and cannot be understood, and that it permits the public defender by his acceptance or refusal of the case to arbitrarily determine whether or not a particular defendant will have his services, or be entitled to the services of another attorney. Under the circumstances of this case, defendant is neither granted nor denied any rights by the provisions of this section, and therefore has no standing to attack it.

In a further attempt to support his position defendant complains of specific conduct of the public defender. Inquiry by the court at the hearing on the first motion revealed that defendant's objection to representation by the assigned assistant public defender was predicated on the following grounds: (1) that he allegedly failed to object to the motion to substitute photographs for the fur coats; (2) that he allegedly "instructed," or did "suggest" that defendant plead guilty to one of the two charges without indicating which one; (3) that

counsel, such counsel, in a county, or city and county, in which there is no public defender, *or in a case in which the court finds that because of conflict of interest or other reasons the public defender has properly refused to represent the person accused,* shall receive a reasonable sum for compensation and for necessary expenses, the amount of which shall be determined by the court in accordance with this section, to be paid out of the general fund of the county.'' ( Italics added. Changes in the text by Stats. 1965, ch. 1707, § 1, p. 3841, which antedate defendant's arraignment and trial, have not changed the language upon which he relies.)

he failed to make a motion to dismiss the indictment under the provisions of section 995 of the Penal Code Now, after a study of the record, he adds: (4) that the public defender advised and participated in defendant's waiver of a jury trial; (5) that he allegedly failed to conduct proper pretrial discovery to secure statements in the hands of the prosecution; (6) that he allegedly refused to make the motion to reduce bail; (7) that after he was relieved, and while sitting in an advisory capacity, he interjected himself into the case and interfered with defendant's presentation (a) by advising the arraigning judge, upon his inquiry, that there were no grounds for a motion to dismiss the indictment, (b) by advising the trial judge concerning the prior motion for dismissal of counsel, and (c) by advising the trial judge, while he was considering defendant's motion for discovery, that defendant had been furnished the grand jury transcript.

According to the public defender the motion to substitute photographs for two fur coats was made and was granted while defendant was still conferring with him in open court. The question of reopening the matter was a matter of tactics upon which the attorney's exercise of discretion should not be disturbed in the absence of some show of prejudice to the defendant. Defendant was unable to advance any sound reason for objecting when queried by the court. At the trial, his objection to the use of the photographs was predicated upon the theory that neither he nor any representative was present when they were made. The photographs were authenticated as pictures of the stolen furs by the owner of the store, the two officers who saw them in the car, and the inspector who supervised the taking of the pictures and returned the furs to the owner's insurer. (See *People* v. *Bowley* (1963) 59 Cal.2d 855, 859-861 and 862 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].)

The trial court was satisfied that there had been no impropriety in the public defender's giving the defendant his opinion of the probable outcome of the case, and the suggestion that if he wanted to enter a plea to one count the district attorney would move to dismiss the prior. This court should not interfere with that determination. In view of developments the advice was sound.

The question of whether to interpose a motion to dismiss an indictment, or information, is a legal question to be determined by the attorney. (*People* v. *Nailor* (1966) 240 Cal.App. 2d 489, 494 [49 Cal.Rptr. 616]; and see *People* v. *Tillman*

(1965) 238 Cal.App.2d 134, 140 [47 Cal.Rptr. 614].) The grand jury transcript is not before this court, but from the references to it at the trial it appears that there was ample evidence to hold the defendant to answer. As has been demonstrated there were no valid grounds for attacking the arrest and the use of the evidence which was taken into custody. The public defender no doubt recognized the futility of making the motion. (See *People* v. *Amado* (1959) 167 Cal.App.2d 345, 347 [334 P.2d 254].)

Defendant on his own behalf waived a jury trial with his counsel's concurrence. He did not subsequently communicate to the court any dissatisfaction with his former counsel's advice on this matter, and never sought to revoke that waiver after dismissing his counsel. He was fairly tried and can show no prejudice from the waiver. He certainly should not be permitted to take his chances, without objection, in a court trial, and then, after an adverse decision, seek a reversal on the grounds he improperly waived a jury.

The defendant made a motion for discovery which was granted. He subsequently acknowledged he had received all the material he wanted. From all that appears this material would have been furnished to the public defender upon request to the prosecutor. Defendant now asserts prejudice in that tapes of the police broadcasts concerning the robbery and his arrest, were no longer available when requested on July 30th. He was furnished with the written information upon which the broadcasts were based and the communication officers testified to the content of the messages.

The record does not show that the public defender was ever requested to make a motion to reduce bail. If such a request had been made it may well be that the attorney knew it was foredoomed to fail because of the defendant's record. No failure to exercise proper discretion is found.

The comments by the assistant public defender after he had been relieved as counsel were all made at the request of the court, or to advise the court properly, and in no sense prejudiced defendant or manifested such a disregard of defendant's rights as could be retroactively applied to justify the defendant's dismissal of his attorney.

Defendant has failed to show that his dismissal of the public defender was warranted. The following observations are pertinent: ''It is also a sound concept that the court-appointed attorney as well as the accused is entitled to fair consideration. An attorney at law is a member of an ancient, honorable

and deservingly honored profession. He is regarded as an officer of the court, of any court in which he appears. Whether appointed to represent an indigent or employed by a man of wealth or by the state, the diligence and quality of the lawyer's service and the ethical standards of his conduct are the same; his office and the prerogatives of that office, and the respect due to him in the discharge of his duties, are the same. The court should not appoint counsel—whether to defend an indigent or otherwise—and require of him that in so doing he surrender any of the substantial prerogatives traditionally or by statute attached to his office.

"The right of an accused to the services of an attorney contemplates that the attorney will investigate possible defenses or alternative procedures and advise the accused of his conclusions, not, as this defendant requested, that the attorney will act as a mere subservient helper under the direction of the accused. Neither the express provisions of California law nor general considerations of fairness require that an intelligent, competent defendant who obdurately insists upon controlling and conducting his own defense should be entitled as a matter of right to the services of counsel to act under defendant's control. Where a defendant charged with crime is unable to employ counsel, is not statutorily required to have counsel . . . , and is competent to decide whether he desires counsel, the defendant during the proceedings before the magistrate and the trial court has as a matter of absolute right but two choices in the matter of a court-appointed attorney: he can accept representation by counsel (as most defendants with the ability to employ counsel have the good sense to do) or he can elect to represent himself." (*People* v. *Mattson, supra,* 51 Cal.2d 777, 793-794; and see *People* v. *Bourland, supra,* 247 Cal.App.2d 76, 83.)

Defendant complains that if he fails to voice his views in the lower court he may, thereafter, be deprived of the right to complain of the actions of his appointed counsel. (See *People* v. *Wright* (1963) 221 Cal.App.2d 109, 113 [34 Cal.Rptr. 292]; *People* v. *Prado* (1961) 190 Cal.App.2d 374, 377 [12 Cal.Rptr. 141]; *People* v. *Amado, supra,* 167 Cal.App.2d 345, 347; *People* v. *Comstock* (1956) 147 Cal.App.2d 287, 299 [305 P.2d 228]; *People* v. *Hood* (1956) 141 Cal.App.2d 585, 590 [297 P.2d 52]; *People* v. *Wilkerson* (1955) 130 Cal.App.2d 330, 333 [279 P.2d 56]; and *People* v. *Younders* (1950) 96 Cal. App.2d 562, 569 [215 P.2d 743].)

The cases cited do not stand for the proposition that if he

does speak up he will be entitled to new counsel. The rule of those cases "affords him the opportunity to complain when, at any time during the trial his counsel did not adequately represent him, *thereby affording the trial court an opportunity to correct the situation.*" (*People* v. *Hood, supra*, 141 Cal.App. 2d 585, 589-590, italics added.)

In the instant case the arraigning judge attempted to correct the situation as revealed by defendant's expressed objections. *He attempted to show the needlessness* of retaining the merchant's stock in trade (an indication that the motion to substitute the photographs of the furs would have been adopted over defendant's objections), and he attempted to throw oil on the troubled waters which had been lashed up by what was the attorney's considered advice on a plea. The judge, finding no merit in defendant's complaints, attempted to have him retain the public defender, but he was adamant in pressing his motion to proceed in propria persona.

In general the cases last cited present situations where there was a misunderstanding as to tactics (e.g., *People* v. *Hood, supra*, 141 Cal.App.2d at pp. 587-589). A reconciliation of the defendant's recognized right to complain with the principle, noted above, that there is " 'no consitutional right to an attorney who will conduct the case in accordance with an indigent defendant's whims' " requires that to justify appointment of a new counsel there must be a bona fide showing that the first appointed counsel "is not adequately representing the accused." (See *People* v. *Bourland, supra*, 247 Cal.App.2d at p. 84; and *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-465 [34 Cal.Rptr. 863, 386 P.2d 487]; and cf. *People* v. *Tillman, supra*, 238 Cal.App.2d 134, 140; *People* v. *Prado, supra*, 190 Cal.App.2d 374, 377-388; *People* v. *Amado, supra*, 167 Cal.App.2d 345, 347-348.)

Defendant demonstrated familiarity with his right to move to dismiss the indictment, with his right to trial before another judge because of possible prejudice (by his motion for "change of venue"), with his right to a continuance to further prepare for trial, with his right to discovery, with his right to move to suppress evidence, with his right to exclude witnesses from the courtroom, with the right of the prosecutor to retain an investigator as an advisor, with his right to secure the testimony of a prisoner, with the procedure of impeachment by grand jury transcript or prior statements, and with current cases on search and seizure. A review of the record reveals unquestionably that he was capable of repre-

senting himself, and freely and intelligently waived his right to counsel with appreciation of its consequences.

The lower court properly denied defendant's motion for the appointment of an alternative attorney, and committed no · error in granting his motion to appear in propria persona. Defendant was not deprived of any constitutional right to counsel or to due process of law.

■ Finally, he contends he was denied his constitutional rights because no new appointment of counsel was offered or made on his sentencing. (See *In re Turrieta* (1960) 54 Cal.2d 816, 819-820 [8 Cal.Rptr. 737, 356 P.2d 681].) In the case last cited, in which judgment was pronounced almost two years after the defendant, who waived counsel, had been convicted on her plea of guilty, the court said: "It must also be conceded that generally where a defendant has intelligently waived counsel the burden is on him to take some affirmative action to reinstate his right thereto. In such instances a motion for the assistance of counsel would be directed to the sound discretion of the trial court. Thus in the case of *In re Connor*, 16 Cal.2d 701 [108 P.2d 10], the defendant waived counsel at the beginning of trial proceedings and thereafter, during the prosecution's case, demanded the appointment of counsel. The court properly denied the motion in the circumstances there prevailing. (See also *People* v. *Mattson*, 51 Cal. 2d 777, 789 [336 P.2d 937].)" (54 Cal.2d at p. 821.) So here "no infringement of the defendant's right to be represented at sentencing occurs when a valid waiver of counsel has taken place at an earlier stage of the proceedings. The statement of an unrepresented defendant's right to counsel need not be repeated every time he comes to court; . . . When he appeared later for sentence, the court was not required to ask him whether his waiver still held good." (*In re Grayson* (1966) 242 Cal.App.2d 110, 114 [51 Cal.Rptr. 145].)

### Errors at Trial

Defendant's objections to the validity of his waiver of jury trial, to the denial of his motion to suppress, to the use of photographs of certain fur coats, and to use of his prearraignment statements have all been covered above.

■ He complains of the court's failure to declare a mistrial upon his motion made after his question, "Are you presently under the influence of any narcotics, Mrs. Sanders?" elicited the reply, "Why? Because you was sent up 20 years for it."

The record reveals that the court did not hear the question,

or, at the very least, wished to disregard the question. Moreover, this was a trial before the court, and the court had knowledge that the defendant was charged with a previous felony conviction. It is also apparent that the court was not influenced by the statement. In addition, the content of the statement is unrelated to the offense charged, and would carry little weight even if it were considered. Thus, it may be concluded that the failure to declare a mistrial was not prejudicial error.

He asserts that he was denied due process of law because of the manner in which the court conducted the proceedings. On Monday, August 9th, the court adjourned the trial to Friday, August 13th, with the understanding that if another case finished earlier this case would be moved up. Prior to the adjournment, defendant was cross-examining Mrs. Sanders. When the continuance was proposed he stated: "I have no choice about the matter, your Honor. But if I had a choice, I would prefer to continue it at the earliest possible date, and that includes tomorrow."

The court reconvened on Wednesday, August 11th. Mrs. Sanders was not present. The defendant objected and stated, "I'm not objecting to the procedure. . . . I am just objecting to the manner in which they are being proceeded. In other words, I would like to finish cross-examining Miss Sanders first." The court granted the district attorney's motion to advance and he proceeded with the presentation of his case. Defendant's stated objection did not appear to go to the fact that the trial had reconvened prior to the time set at adjournment, but rather to the fact that his cross-examination of Mrs. Sanders was being interrupted. On this score, the matter would appear to be governed by the court's general power to control the proceedings. (See Pen. Code, §§ 1044, 1093 and 1094.) In the absence of objection to the uncertainty of the time of reconvening as announced at adjournment, and in view of defendant's desire to reconvene as soon as possible, he cannot be heard to object at this state of the proceedings. No prejudice has been shown.

Defendant's reliance upon the procedure to advance by motion set forth in rule 225, California Rules of Court, is not pertinent. That section appears to apply to advancing the date to commence the trial, and does not apply to a recess which it has been agreed could be shortened. Moreover, the context of that rule indicates that it refers to civil and not criminal cases.

The requirement of a public trial (U.S. Const., 6th Amend.; Cal. Const., art. I, § 13) does not require public notice of each adjournment and reconvening of any particular trial—only that the proceedings be open to the public.

 Defendants' contention that he was prejudiced because five of his witnesses were called before the prosecution concluded its case, evaporates under the light of the record which discloses that in each case he either requested or consented that the witness be called. (See Pen. Code, §§ 1044, 1093 and 1094, *supra*.)

"[I]t is is the duty of the court to safeguard and promote the orderly and expeditious conduct of its business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper or delay the conduct and dispatch of its proceedings." (*People* v. *Matteson, supra,* 51 Cal.2d 777, 792; and see *People* v. *Ortiz, supra,* 195 Cal.App. 2d 112, 116.)

Defendant complains of irregularities in connection with attempts to get Todd's version of the happenings of the morning of June 20th. Following his motion for discovery, defendant sought process to secure the presence of Todd, who was imprisoned on another offense, as a witness. The district attorney suggested that he might stipulate to the statement Todd would give. Norman was hesitant to enter into such a stipulation, but finally suggested: "Well, Mr. District Attorney, would you be willing to stipulate to the fact that Mr. Todd would testify that I had nothing to do with this burglary whatsoever? Would you be willing to stipulate to that?" The offer was rejected by the prosecutor.

In some manner the defendant seeks to link this revocation of the offer to stipulate with the unproductive session with Todd on the witness stand. The witness gave his name and address, and stated that he was in custody at San Quentin in parolee status. Other questions only produced a retreat to the protection of the Fifth Amendment. Defendant apparently feels that the prosecutor drew out of him what he hoped Todd would say, and then induced Todd to refuse to testify. There is no evidence to sustain these suspicions, or any conclusion other than that Todd wanted to avoid any implication in the charged burglary.

The use of Todd's statement to the investigator has been mentioned above. It was properly admitted, not as proof of what was asserted, but to show defendant's reaction upon hearing it. Defendant's assertion that he was denied confron-

tation of the witness in violation of the Sixth Amendment (see *People* v. *Volk* (1963) 221 Cal.App.2d 291, 296 [34 Cal. Rptr. 351]), is really an objection that the statement was inadmissible hearsay. It collapses with the limited admissibility of the statement. (See Witkin, Cal. Evidence (2d ed. 1966) § 529, subd. 6; and § 530, second, subd. b, pp. 502 and 504.)

*Sufficiency of Evidence*

When the prosecution had concluded its case, except for its last witness, defendant again attacked the evidence by seeking to reopen his motion to suppress. This motion was denied, as was a subsequent motion to dismiss. Insofar as this motion attacked the legality of his arrest, the evidence obtained by the police and the sufficiency of his indictment, it is governed by principles set forth above.

He asserts that it was error to deny the motion to dismiss, and that the case should be reversed because the evidence is insufficient. The testimony of Daubenspeck and the officers is sufficient to uphold the conviction. Therefore, defendant's objection that Mrs. Sanders' testimony should be disregarded as that of an uncorroborated accomplice (see Pen. Code, § 1111) is rendered untenable. The testimony of the manager, which tends to put him in the restaurant at a time before the car could have come to rest on Fillmore Street, at best creates but a conflict in the evidence. Similarly the attempted impeachment of Officer Roberts by showing that he failed to immediately report defendant's identity is a matter that cannot be weighed at this level. There is no dearth of evidence to support the findings of fact implicit in the decision of the trial court and there the matter must rest.

*Bail on Appeal*

In his closing brief defendant attacks the order of the superior court denying bail on appeal on the grounds that a judge other than the judge who conducted the trial, and to whom the application was addressed, passed on the motion. It has been said: "The facts and circumstances going to make up the legal discretion in the sound exercise of which the prisoner may be admitted to bail, are necessarily within the knowledge of the Judge who presided at the trial, and, in practice, the power to admit to bail pending the appeal, ought not to be exercised by us in the first instance, or until after the determination of the application below on its merits." (*People* v. *Perdue* (1874) 48 Cal. 552, 553; *People* v. *Oreck,*

*supra,* 69 Cal.App.2d 317, 318 [158 P.2d 940].) There is no legal requirement that the application be made and considered by such judge. Any magistrate having the power to issue a writ of habeas corpus may admit the defendant to bail (Pen. Code, § 1291), and reference to the judge before whom the defendant was tried is only suggested "if practicable" (see *Ex parte Turner* (1896) 112 Cal. 627, 629 [45 P. 571]). The record here does not disclose whether or not it was practicable to refer defendant's application to the judge who conducted the trial.

"An application to the reviewing court for bail . . . on an appeal pending therein . . . shall include a showing that proper application for bail . . . was made to the superior court and that such court unjustifiably denied the application." (Cal. Rules of Court, rule 32(b).) The "Motion for Bail Pending Appeal" filed with this court (October 29, 1965) failed to show that application had been made to the court below. It was denied November 1, 1965. A subsequent "Application for Bail Pending Appeal" filed January 25, 1966, referred to the application to the lower court which is reflected in the record on appeal and raised the objection considered and disposed of above. This application was denied January 27, 1966. A third application for bail was filed November 23, 1966, and alleged: "That he has applied to the trial court for bail and that that court has unjustifiably denied him bail and that he is rightfully entitled the same." This motion was denied November 23, 1966.

Other than as stated above, the defendant failed to show in what respects the superior court's action in denying bail was unjustifiable. Reference to the defendant's application to the trial court fails to reveal any facts upon which the trial court could make a determination that if the defendant were admitted to bail there would be a practical assurance that the defendant would attend upon the court when his presence was required (see Pen. Code, § 1275), nor does it appear that notice of the application was given to the district attorney as required by section 1274 of the Penal Code. Under these circumstances the matter is governed by the general rule enunciated in *In re Brumback* (1956) 46 Cal.2d 810, at page 813 [299 P.2d 217], as follows: "It is settled that the primary discretion belongs to the trial judge and that it is a sound legal discretion to be exercised in the light of all attending circumstances. [Citations.] He should recognize that the primary purpose of bail, before or after conviction, is practical

assurance that defendant will attend upon the court when his presence is required. Where the trial judge has passed upon the merits of the application his ruling will not be disturbed unless a manifest abuse of discretion appears [citations], or 'circumstances of an extraordinary character have intervened since conviction which make such action obviously proper.' (*Ex parte Turner, supra,* 112 Cal. 627, 629.)'' (See also *In re Scaggs* (1956) 47 Cal.2d 416, 418-419 [303 P.2d 1009]; and *People* v. *Oringer* (1961) 193 Cal.App.2d 19, 28 [14 Cal.Rptr. 95].) Defendant has failed to allege any facts showing a manifest abuse of discretion.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied August 1, 1967, and appellant's petition for a hearing by the Supreme Court was denied October 5, 1967. Sullivan, J., did not participate therein.